UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                    :

MENACHEM ISAKOV,                    :
                                      :

                Plaintiff,           :   **MEMORANDUM DECISION AND**
                                      :   **ORDER**

         - against -              :
                                      :   17-CV-5775 (BMC)

HASC CENTER, INC., BLIMA DRUKER,  :
SAMUAL KAHN, MARK SCHWARTZ,    :
                                      :

             Defendants.         :
                                      :
------------------------------------------------------------ X

**COGAN,** District Judge.

       Plaintiff, an employee of the HASC Center, Inc. ("HASC"), a service provider for the disabled, alleges that he was discriminated against based on race and religion, and was subject to a hostile work environment, retaliation, and wrongful termination.

       He brings his claims under Title VII of the Civil Rights Act of 1964, 42. U.S.C. §§ 2000e *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"). Defendants (HASC and supervisors and managers of HASC) have moved to dismiss all of the claims. For the reasons discussed below, defendants' motion to dismiss is granted and denied in part.

## BACKGROUND

       In December 2012, plaintiff began his employment with HASC as a Direct Care Counselor for people with special needs. At the time, plaintiff practiced Orthodox Judaism and wore corresponding religious attire (including dress pants, button down shirts, and a yarmulke[1])

---

[1] Jewish religious accessory worn during certain prayers.

Plaintiff alleges that he excelled in his position and was promoted to Senior Counselor status in June 2013.

At approximately eight staff meetings throughout 2013, plaintiff's manager, Mark Schwartz, told plaintiff that anyone working the Shabbat shift who was Jewish was required to observe Shabbat according to Orthodox Jewish tradition.[2]  Schwartz told plaintiff that Jewish counselors had previously been fired for breaking the Shabbat.  Schwartz also told plaintiff that he had to wear Orthodox attire when he worked, instruct his staff to do the same, and wear Orthodox attire when accompanying residents outside of HASC residences.  This policy did not apply to non-Jewish workers.  Plaintiff alleges that HASC hired African-American workers so that individuals in the community would be able to differentiate between Jewish and non-Jewish HASC employees and conclude that all Jewish HASC employees were practicing Orthodox Judaism.

In September 2013, plaintiff stopped practicing Orthodox Judaism and began practicing what he describes as "Traditional Judaism."[3]  He accordingly stopped wearing Orthodox attire. However, plaintiff alleges that he continued to observe Shabbat while on shift, out of fear that he would otherwise lose his job.

That month, plaintiff's supervisor observed him in jeans and a t-shirt and was apparently "shocked" at his appearance.  Plaintiff claims that on several occasions, he forgot to wear his

---

[2] "[D]ay of holiness and rest observed by Jews from sunset on Friday to nightfall of the following day." Encyclopedia Britannica, https://www.britannica.com/topic/Sabbath-Judaism (last visited Feb. 26, 2018).

[3] "Orthodox Judaism is distinguished by its maintenance of the traditional forms of worship in the Hebrew language, and of the traditional observances as prescribed by the Torah. Men and women sit separately in Orthodox synagogues and women do not participate in some of the rituals." Israel & Judaism Studies, http://www.ijs.org.au/Variants-within-Judaism/default.aspx.  (last visited Feb. 26, 2018).  Plaintiff describes that he switched from practicing Orthodox Judaism to practicing "Traditional Judaism," but the practice he describes may accord with better-known "Modern Orthodox," or "Conservative Judaism." See generally Jewish Virtual Library, http://www.jewishvirtuallibrary.org/background-and-overview-of-conservative-judaism (last visited Feb. 26, 2018).

yarmulke when going to work (he did not wear it outside of work) and was fearful of going to meetings with HASC management because he knew based on previous conversations with Schwartz that it would be reported to his manager and he would be disciplined and probably terminated. In October 2013, Schwartz told plaintiff that he was forbidden to eat non-kosher food in front of the residents, and that if he were seen doing so, it would be grounds for immediate termination. Schwartz instructed plaintiff to enforce this rule with other HASC employees. Non-Jewish employees were permitted to eat non-kosher food.

From February 2014 through December 2015, plaintiff monthly asked Schwartz for a pay raise, which plaintiff never received. Plaintiff complained that other less experienced employees were paid more than him, and at least one time asked if an employee received more pay "because he looks like a Rabbi." Schwartz responded, "that may be." At no time did Schwartz ever indicate that plaintiff's inability to secure a raise had anything to do with his performance. In fact, Schwartz remarked that plaintiff made "a great seniors counselor," was "doing well running the house," and acknowledged that, "it's not your performance, Menachem, you are great with the guys."

However, on nearly every occasion that plaintiff asked Schwartz for a raise, Schwartz told plaintiff that a pay increase turned on his appearance, and specifically on the fact that he no longer looked like an Orthodox Jew. For instance, Schwartz remarked, "maybe if you grew your beard back and looked '*Yeshivish*' something could be done," "maybe if you grew your beard back something would happen, wear a larger *kippah* [*yarmulka*], you know, the works," "like I told you, maybe grow a beard, wear dress pants," "you won't get it unless you look like you belong in the community," and "try looking Orthodox." Some of Schwartz's responses were

more general, including, "maybe if you looked the part you would get a higher pay as well," and "dress for the job that you want and not the job that you have."

On the other hand, sometimes Schwartz indicated that plaintiff's non-Orthodox practice itself was a problem, and not just how he looked: "HASC looks for specific type of individuals to work and rise in the ranks of HASC"; "you know maybe if you were '*Yeshivish*' and married with a kid on the way it would make a difference"; "a young orthodox man and part of the community, starting a new family, I am sure something could be done"; "Menachem it is up to you what you want to practice, but I am not saying it won't help," and "HASC is looking for '*Yeshivish*' guys."

Plaintiff alleges that in September 2015, Schwartz told him that Kahn had visited a residence where plaintiff was working, was displeased at his appearance, and that Schwartz said that he "wouldn't want to lose a good counselor." Schwartz then remarked, "[y]ou know what needs to be done to get ahead."

In April 2016, Kahn visited a residence where plaintiff was working. Plaintiff was wearing a yarmulke, jeans, and a t-shirt. Kahn ignored plaintiff and paid attention only to a new hire who practiced Orthodox Judaism, despite the fact that plaintiff was the Senior Counselor present. The next month, Isakov again asked Schwartz for a pay raise. Schwartz told him that to get a raise, he would have to "impress the right people," which would entail "look[ing] the part . . . ."

In July 2016, Druker visited a residence where plaintiff was working and saw him without a *yarmulke*. That day, Schwartz fired plaintiff, telling him that he was not the right fit. Schwartz told plaintiff that "we are making lots of changes around the house," and "we are cleaning house." After plaintiff protested, Schwartz agreed to let him work two Shabbat shifts a

month and stay on as a substitute.  Roughly two weeks later, plaintiff called HASC to find out which shifts he would work.  Yehuda Osipov (an HASC employee) informed him that Druker did not want non-religious Jews working for the agency, and so plaintiff was formally terminated.

## DISCUSSION

The Supreme Court has defined the standard on a motion to dismiss for failure to state a claim as a "two-pronged approach." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, a court must construe a complaint's factual allegations as true, but need not accept the veracity of legal conclusions.  Id. at 678.   A "complaint [will not] suffice if it tenders naked assertions devoid of further factual enhancement."  Id. (internal quotations and alterations omitted).  Likewise, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions are inadequate . . . ." Cox v. Nassau Cty. Corr. Ctr., No. CV 11-1937, 2013 WL 831194, at *1 (E.D.N.Y. Feb. 15, 2013), report and recommendation adopted, No. 11-CV-1937, 2013 WL 828949 (E.D.N.Y. Mar. 6, 2013).  "While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." ECOR Sols., Inc. v. Malcolm Pirnie, Inc., No. 1:02CV01103, 2005 WL 1843253, at *3 (N.D.N.Y. July 29, 2005).

Second, a court must determine whether the complaint "states a plausible claim for relief," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.

Accordingly, to defeat a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550

U.S. 544, 547 (2007)).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citation omitted).  Therefore, the "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (citation omitted).  Neither legal conclusions nor "[t]hreadbare recitals of the elements of a cause of action" state a claim because "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 678-79 (citation omitted).

I.  Claims under Title VII of the Civil Rights Act of 1964

    A.  *Discrimination*

        1.  Timeliness

"For a Title VII claim to be timely, the alleged discriminatory conduct must have occurred less than 300 days prior to the filing of the [Equal Employment Opportunity Commission ("EEOC")] charge."  Taylor v. City of New York, 207 F. Supp. 3d 293, 300 (S.D.N.Y. 2016).  "This statutory requirement is analogous to a statute of limitations."  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996).  "As such, it is meant to put the adversary on notice to defend within a specified period and to promote the right to be free of stale claims."  McPherson v. New York City Dep't of Educ., 457 F.3d 211, 214 (2d Cir. 2006) (internal quotations omitted).  Plaintiff submitted a Charge of Discrimination to the EEOC on February 22, 2017, and received his Right to Sue Letter on March 29, 2017.  Therefore, plaintiff may only bring claims under Title VII arising out of discriminatory conduct that took place after April 28, 2016 (300 days before he filed his EEOC complaint).  See Szuszkiewicz v. JPMorgan Chase Bank, 12 F. Supp. 3d 330, 338 (E.D.N.Y. 2014).

"Under Title VII's continuing violation doctrine, if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Washington v. Cty. of Rockland, 373 F.3d 310, 317 (2d Cir. 2004) (internal quotations omitted). In National Railroad Passenger Corporation v. Morgan, 536 U.S. 101 (2002), "the Supreme Court made clear that the word 'practice' in this context refers to a discrete act or single occurrence, and that a discrete retaliatory or discriminatory act occurred on the day that it happened." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 78-79 (2d Cir. 2015) (internal quotations omitted). Therefore, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. (internal quotations omitted). "With respect to claims based on termination, failure to promote, denial of transfer, or refusal to hire, [Title VII] precludes recovery for *discrete* acts of discrimination or retaliation that occur outside the statutory time period, even if other acts of discrimination occurred within the statutory time period." McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) (internal citations and quotations omitted).

Plaintiff bears the burden of establishing the applicability of the continuing violations doctrine. See Norman v. Metro. Transit Auth., No. 13-CV-1183, 2014 WL 4628823, at *5 (E.D.N.Y. Aug. 1, 2014), report and recommendation adopted sub nom. Norman v. Metro. Transp. Auth., No. 13-CV-1183, 2014 WL 4628848 (E.D.N.Y. Sept. 15, 2014).

Here, plaintiff merely makes a conclusory assertion that the continuing violation doctrine applies to his discrimination claims. That is insufficient. Accordingly, plaintiff's Title VII discrimination claims are limited to his allegations of allegations regarding his denial in May 2106 of a pay raise and his termination in July 2016.

2.  Sufficiency

"[A]n employment discrimination plaintiff need not plead a *prima facie* case of discrimination, [but] dismissal is nevertheless appropriate where the plaintiff failed to allege even the basic elements of a discriminatory action claim." Jones v. City of New York, No. 14-CV-0826, 2015 WL 502227, at *4 (E.D.N.Y. Feb. 5, 2015) (internal citations omitted). Those basic elements are first, that the "mistreatment at work occur[ed] because of . . . [a] protected characteristic," and second, that "the action that is alleged . . . must rise to the level of an adverse employment action." Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). "[A]n action must cause a materially adverse change in the terms and conditions of employment, and not just "mere inconvenience, in order to qualify as 'adverse.'" Id. Examples of materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotations omitted). A plaintiff may plead such allegations "either (1) directly, by alleging facts that show an intent to discriminate, or (2) indirectly, by alleging circumstances that give rise to a plausible inference of discrimination. Guy v. MTA New York City Transit, No. 15-CV-2017, 2016 WL 8711080, at *6 (E.D.N.Y. Sept. 23, 2016) (internal citations omitted).

"It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic." Patane, 508 F.3d at 112 (internal quotations omitted).

Plaintiff alleges clear religious discrimination in violation of Title VII. Plaintiff details that for nearly two years before his final raise denial and subsequent termination, Schwartz

explicitly conditioned any pay increase on his appearing to be an Orthodox Jew and actually practicing Orthodox Judaism. Schwartz even acknowledged that plaintiff's performance was exemplary. Plaintiff was told that he was going to be fired on the same day that Druker saw him working without a *yarmulke*, and, at the time, he was offered no performance-based reason. What's more, when he was officially terminated two weeks later, Osipov expressly told plaintiff that Druker did not want "non-religious Jews" working for the agency.

Plaintiff, in sum, describes that defendants – a healthcare agency that seems to primarily serve the Orthodox community, and its managers who apparently practice Orthodox Judaism – imposed the requirements of their religious practice and belief upon him, and fired him when he did not comply. At the pleading stage, plaintiff does not need to claim any more than he has; he has clearly alleged facts sufficient to "nudge" his claim of religious-based discrimination "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Plaintiff also claims race-based discrimination. His claim turns on his allegation that non-Jews were not held to the same standards as Jews, insofar as they did not need to adhere to the strictures of Orthodox Judaism, and that accordingly had he not been Jewish, he would have received his requested pay raises and not been terminated.

"[T]he Second Circuit has not ruled on whether Jewish ancestry is a class protected by Title VII, such that discrimination based on Jewish ancestry could be challenged . . . ." Doran v. New York State Dep't of Health Office of Medicaid Inspector Gen., No. 15CV7217, 2017 WL 836027, at *12 (S.D.N.Y. Mar. 2, 2017). However, the Second Circuit has held that other civil rights statutes, such as the Civil Rights Act of 1866, 42 U.S.C. § 1981, do protect the Jewish "race" from race-based discrimination. See United States v. Nelson, 277 F.3d 164, 177-

78 (2d Cir. 2002).  The Court can think of no good reason to find the Jewish race to be a protected race under one statute, but not another.

Plaintiff alleges that because he was Jewish, he was compelled to wear Orthodox attire and comply with the tenants of Orthodox Judaism, while non-Jewish employees did not have to. He was repeatedly told that (presumably because he was Jewish), he should look the part and practice Orthodox Judaism.  When he was terminated, plaintiff was also told that HASC did not want to employ "non-religious Jews," although his allegations support concluding that HASC was fine with hiring non-Jews.  Plaintiff has, in short, described that he suffered adverse employment events because of his membership in a protected class – had he not been Jewish, he seemingly would not have been compelled to change his conduct and his faith, and would have likely enjoyed a raise and continued employment.

### A. *Hostile Work Environment*

#### 3. Timeliness

As noted above, discrimination claims based on "discrete acts" that fall beyond the statutory time period are precluded under Title VII.  See McGullum, 609 F.3d at 75.  On the other hand,

> [h]ostile work environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.  Accordingly, consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.

Id. (internal citations and quotations omitted).  In other words, so long as one event contributing to a hostile work environment claim is alleged to have occurred after the look-back period cutoff,

that later violation "anchors" earlier, related acts, and the continuing violation doctrine allows the presentation of a timely, single claim.

Here, plaintiff's allegations of a hostile work environment turn on comments about the way he dressed, his denial of a pay raise, and being ignored by Kahn; in short, being made to feel uncomfortable or lesser because he was not Orthodox. Because instances of this kind of alleged mistreatment occurred after plaintiff's look-back period cutoff, they "anchor" earlier, related acts, and the continuing violation doctrine allows the presentation of a timely, single claim.

> 1. Sufficiency

To state a hostile-work environment claim under Title VII, a plaintiff must plead facts showing that his workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation omitted) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)). "[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotations omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015). Critically, the complained of conduct must have been prompted by the plaintiff's status. "It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001);

see e.g., Davis v. New York City Dep't of Corr., No. 17-CV-3863, 2017 WL 5634123, at *5 (E.D.N.Y. Nov. 22, 2017) ("Plaintiff fails to allege any relationship between such conduct and his status as a member of a protected class."); Richard v. New York City Dep't of Educ., No. 16-CV-957, 2017 WL 1232498, at *14 (E.D.N.Y. Mar. 31, 2017) ("Plaintiff does not state a hostile work environment claim because his allegations are insufficient to allege animus based on his race, color or ethnicity.").   In assessing a hostile work environment claim, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 203 (2d Cir. 2014) (internal quotations omitted).

Anti-discrimination laws "are intended to protect employees from genuine workplace mistreatment and harassment; they are not intended to guarantee that employees will never suffer inconveniences or that their every desire will be fulfilled." Ruggieri v. Harrington, 146 F. Supp. 2d 202, 218 (E.D.N.Y. 2001).  Hostile work place claims should "not [be] intended to promote or enforce civility, gentility or even decency." Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011).  Thus, "Title VII does not establish a 'general civility code' for the American workplace." Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004).  "Isolated instances of harassment ordinarily do not rise to this level." Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 430 (E.D.N.Y. 2009).  Plaintiff does not allege any conduct that comes close to describing a hostile work environment.  Plaintiff merely claims that Schwartz told him he should change his appearance and his practice, that he was afraid of being seen if not wearing the trappings of Orthodox Judaism, and that once, Kahn ignored him.  These allegations fall far short of the exacting standard required to state a claim for a hostile workplace environment, which demands that a plaintiff claim that the conditions of his employment have been materially altered

by discriminatorily motivated abuse. Plaintiff might not have liked this conduct, but that does not make it actionable.

### B. *Retaliation*

#### 4. Timeliness

Because plaintiff's retaliation claim turns on discrete adverse acts, it, like his discrimination claim, discussed above, requires the underlying adverse employment action to have occurred within the statutory period. Accordingly, plaintiff is limited to pleading retaliation based on his April pay raise denial and his termination.

#### 5. Sufficiency

Title VII provides that an employer may not "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful practice [by Title VII.]" 42 U.S.C. § 2000e–3(a). "Retaliation occurs when an employer takes action against an employee not because of his ethnicity, but because he engaged in protected activity – complaining about or otherwise opposing discrimination." Vega, 801 F.3d at 91. Therefore, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated – or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." Id. at 89-90. "Unlike Title VII discrimination claims, however, for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." Id. at 90.

"[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. (internal quotations omitted). "This definition covers a broader range of

13

conduct than does the adverse-action standard for claims of discrimination under Title VII." Id.

"Protected activity for purposes of Title VII [] retaliation claims encompasses an employee's complaint to supervisors about alleged unlawful activity, even if the activity turned out not to be unlawful, provided that the employee had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." Irons v. Bedford-Stuyvesant Cmty. Legal Servs., No. 13-CV-4467, 2015 WL 5692860, at *19 (E.D.N.Y. Sept. 28, 2015).

Plaintiff complained repeatedly about his denial of a raise. Schwartz, as described above, made clear to plaintiff that the denial of his raise was linked to his non-Orthodox appearance and practice, and on numerous occasions, plaintiff protested the apparent impropriety of these explanations. Plaintiff would be entitled to hold a good faith belief that by repeatedly raising his concern that he was being treated differently than other employees, he was complaining about conduct giving rise to a discrimination claim under Title VII. Plaintiff was terminated roughly two months after his last complaint.

"A plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) (internal quotations and alterations omitted). There is no bright line rule in the Second Circuit for the duration of a period between a protected activity and an adverse action that can support such an inference. See Ellis v. Century 21 Dep't Stores, 975 F. Supp. 2d 244, 284 (E.D.N.Y. 2013) (collecting cases). However, courts in the circuit have held that four and five month gaps are not too attenuated. See Id..

Plaintiff's complaints that he was denied a pay raise because he did not practice Orthodox Judaism were protected activity, and both his pay raise denials and his termination were adverse

employment events. The problem, though, with plaintiff's claim is that he cannot plausibly allege that his complaints were a "but-for" cause of either. As for his pay raise denials, Schwartz expressly and repeatedly stated that plaintiff was not granted a raise because of his appearance and religious practice. As for his termination, Druker allegedly stated that plaintiff was fired because he was not Orthodox. In other words, although suggestive of discriminatory intent in of themselves, Schwartz's comments and Druker's alleged admission of the reason for plaintiff's firing renders it implausible that his complaints served as a but-for cause of either; plaintiff had it made clear to him that other, independent reasons were the causes of the adverse employment events.

## II. Claims Under the Civil Rights Act of 1866

Section 1981 of Title 42 of the United States Code guarantees in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added). Section 1981 thus "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 224 (2d Cir. 2004).

"To state a claim under § 1981, a plaintiff must allege: (1) that he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." Andrews v. Fremantlemedia, N.A., Inc., 613 F. App'x 67, 69 (2d Cir. 2015) (internal quotations omitted). "Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981." Patterson, 375 F.3d at 225. Section 1981 provides a remedy for claims of

employment discrimination, whether or not the plaintiff's employment is secured by a contract. See Leung v. New York Univ., 580 F. App'x 38, 39-40 (2d Cir. 2014) ("Congress intended § 1981 to apply to employment discrimination and Section 1981 provides a vehicle for every employee to remedy racial discrimination in the workplace . . . [p]laintiff's failure to point to a specific written contract outside of their employment relationship is not fatal to their claim.") (internal citations and quotations omitted). Unlike with Title VII, a plaintiff bringing a claim under § 1981 "must sufficiently allege that defendants acted with discriminatory intent." Burgis v. New York City Dep't of Sanitation, 798 F.3d 63, 68 (2d Cir. 2015).

However, "[i]t is [] settled that Section 1981 does not prohibit discrimination on the basis of gender or religion . . . ." Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998); see also Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987). Although, as described above, the Second Circuit has held that the Jewish "race" is protected under § 1981 from race-based discrimination, Nelson, 277 F.3d at 177-78, the statute does not provide a remedy for discrimination against Jews that turns on the mode of their religious observance, as opposed to their ancestry. See e.g., Kratz v. Coll. of Staten Island, No. CIV.A. 96-CV-0680, 2000 WL 516888, at *3 (E.D.N.Y. Mar. 15, 2000) (granting summary judgment dismissing plaintiff's § 1981 claim when plaintiff alleged only that he was discriminated against "for being a non-observant Jew," because plaintiff had not described discrimination based on his Jewish ancestry.).

Because plaintiff plausibly alleges race-based discrimination, he may, for the reasons discussed above in connection with his Title VII race-based claim, proceed with his § 1981 claim. By claiming that he was told management did not want non-religious Jews working for

HASC, plaintiff has sufficiently alleged that defendants intended to discriminate against him because he was a member of the Jewish race.

III.   Claims Under the NYSHRL

Plaintiff's NYSHRL discrimination claims are "analyzed identically" to his Title VII claims, and "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under Title VII."  Diaz v. Local 338 of Retail, Wholesale, Dep't Store Union, United Food & Commercial Workers, No. CV 13-7187, 2014 WL 4364819, at *4 (E.D.N.Y. Aug. 20, 2014), report and recommendation adopted, 2014 WL 5502316 (E.D.N.Y. Oct. 28, 2014).  Therefore, plaintiff may proceed with his religious and race-based discrimination claims.

Similarly, "[h]ostile work environment . . . claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII."  Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006).  Accordingly, plaintiff fails to state a claim under the NYSHRL for a hostile work environment.

The same analysis applies to retaliation claims brought under the NYSHRL and Title VII. See Id., 445 F.3d at 609 ("[R]etaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.").  Plaintiff's NYSHRL retaliation claim is dismissed.

Plaintiff also brings claims under the NYSHRL for aiding and abetting.  "The NYSHRL states that it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under" the statute.  Feingold v. New York, 366 F.3d 138, 157-58 (2d Cir. 2004).  "[A]n individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he "actually participates in the conduct

giving rise to a discrimination claim." <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 107 fn.10 (2d Cir. 2011).[4]

Plaintiff has stated a claim for aiding and abetting liability against Schwartz and Druker. Schwartz allegedly communicated to plaintiff HASC's preference for employees who looked like Orthodox Jews and practiced Orthodox Judaism. Druker allegedly said that HASC did not want to employee non-Orthodox Jews. Because a plausible inference can be drawn that defendants' statements were based on a common discriminatory motivation, plaintiff may proceed with his aiding and abetting claim against these defendants. On the other hand, the allegation that Kahn "ignored" plaintiff is insufficient to serve as a basis for an aiding and abetting claim.

IV.    <u>Claims Under the NYCHRL</u>

"Courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." <u>Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 109 (2d Cir. 2013) (internal citations and quotations omitted). "[E]ven if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." <u>Id.</u> "The statute of limitations for claims under . . . [the] NYCHRL is three years." <u>Soloviev v. Goldstein</u>, 104 F. Supp. 3d 232, 246 (E.D.N.Y. 2015)

---

[4] <u>See</u> <u>Conklin v. Cty. of Suffolk</u>, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012) ("Nevertheless, the law in this Circuit seems clear that a defendant may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability. However, as the employee's liability necessarily hinges on that of the employer, the employer must be held liable for an individual to also be held liable under this provision.").

A. *Discrimination*

To state a discrimination claim under the NYCHRL, the plaintiff "must only show differential treatment of any degree based on a discriminatory motive." Gorokhovsky v. N.Y.C. Hous. Auth., 552 Fed. App'x 100, 102 (2d Cir. Jan. 29, 2014) (quoting Mihalik 715 F.3d at 114); see also Pryor v. Jaffe & Asher, LLP, at *3 (S.D.N.Y. Jan. 15, 2014) (citing Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 39 (2009)).  "[U]nlike under state and federal law, plaintiff need not show that an employment action was materially adverse." Sotomayor v. City of New York, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013). However, "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive . . . *i.e. because of* the protected characteristic." Soloviev, 104 F. Supp. 3d 232, 250 (E.D.N.Y. 2015) (internal quotations and alterations omitted) (emphasis in original).

Because plaintiff states a claim for religious and race discrimination under the more onerous standard of Title VII, he also does so under the NYCHRL, and may proceed with his claims under that statute.

B. *Aiding and Abetting*

Plaintiff also asserts aiding and abetting claims under the NYCHRL.  "The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is 'virtually identical.'" Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004).

Because plaintiff has adequately plead his aiding and abetting claim under the NYSHRL against certain defendants, he may proceed against them with a congruent NYCHRL claim.

C. *Hostile work environment*

To state a hostile work environment claim under NYCHRL, a plaintiff need only allege differential treatment of any degree based on a discriminatory motive. See Gorokhovsky, 552 Fed. App'x at 102 (citing Mihalik, 715 F.3d at 114). "In a hostile work environment claim under the NYCHRL, even a single comment may be actionable in appropriate circumstances." Id. (internal quotations omitted). "Under the NYCHRL, defendants' discriminatory conduct need not be 'severe or pervasive' to create an actionable hostile work environment." Sotomayor, 862 F. Supp. 2d at 261. However, "notwithstanding the liberal construction accorded to such claims . . . the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." Berlyavsky v. New York City Dep't of Envtl. Prot., No. 14-CV-03217, 2015 WL 5772266, at *11 (E.D.N.Y. Aug. 28, 2015), report and recommendation adopted as modified, No. 14-CV-3217, 2015 WL 5772255 (E.D.N.Y. Sept. 30, 2015).

Although plaintiff's hostile work environment claim fails under Title VII, he may proceed with it under the more liberal standard of the NYCHRL.

As discussed above, plaintiff claims that Schwartz told him he should change his appearance and his practice, that he was afraid of being seen if not wearing the trappings of Orthodox Judaism, and that once, Kahn ignored him. Taken together, these allegations – all based on plaintiff's membership in protected classes – describe a work environment permeated for years with a series of low-level slights and comments that under the lesser standard of the NYCHRL describe a hostile work environment.

D. *Retaliation*

"[T]o prevail on a retaliation claim under the NYCHRL, a plaintiff need only show that he took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Anglisano v. New York City Dep't of Educ., No. 14-CV-3677, 2015 WL 5821786, at *10 (E.D.N.Y. Sept. 30, 2015) (internal quotations and citations omitted).

The "but-for" causal requirement of Title VII retaliation claims is replaced in the NYCHRL context with an easier to satisfy requirement that a plaintiff allege only that the challenged "conduct is caused at least in part by discriminatory or retaliatory motives." Mihalik, 715 F.3d at 113. Accordingly, plaintiff may proceed with his NYCHRL retaliation claim based on his repeated pay raise denial and his termination two months after the last of his years' long complaints about his allegedly unfair treatment arising out of the fact that he did not practice Orthodox Judaism. Plaintiff has plausibly alleged that those adverse employment actions were "caused at least in part" by his repeated complaints about what he understood to be the discriminatorily motivated denial of his requests for a pay raise.

E. *Interference*

"Section 8-107(19) of the NYCHRL prohibits any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the enjoyment of . . . any right granted or protected pursuant to this section." N.Y. City Admin. Code § 8-107(19). In other words, Section 8-107(19) "makes actionable intimidation, threats or interference with . . . a person's exercise or enjoyment of rights protected under [the NYCHRL]." Harrison v. SUNY Downstate Med. Ctr., No. 16CV1101, 2017 WL 4326507, at *6 (E.D.N.Y. Sept. 25, 2017). "Threats are required to state a claim for violation of [Section 8-

107(19)]." Keles v. Yearwood, 254 F. Supp. 3d 466, 476 (E.D.N.Y. 2017). "As defined in the Second Circuit, a 'threat' is the creation of an impression of impending injury." Sletten v. LiquidHub, Inc., No. 13 CIV. 1146, 2014 WL 3388866, at *5 (S.D.N.Y. July 11, 2014) (internal quotations and alterations omitted).

Plaintiff alleges that in September 2015, Schwartz told him that Kahn had visited a residence where plaintiff was working, was displeased at his appearance, and that Schwartz said that he "wouldn't want to lose a good counselor." Schwartz then remarked, "[y]ou know what needs to be done to get ahead." This is sufficient to state a claim for interference under the NYCHRL, because plaintiff was threatened with termination if he did not conform to defendants' religious-based preferences.

F. *Employer Liability*

 "The NYCHRL imposes strict liability on employers for discriminatory acts of managerial employees." Garrigan v. Ruby Tuesday, Inc., No. 14 CIV. 155, 2014 WL 2134613, at *6 (S.D.N.Y. May 22, 2014). "Under NYCHRL, an employer is liable for the discriminatory acts of its employees if the employer (1) knew about the employee's conduct and failed to take immediate corrective action, or (2) should have known of the employee's conduct and failed to exercise due diligence to prevent it." Hopper v. Banana Republic, LLC, No. 07 CIV. 8526, 2008 WL 490613, at *3 (S.D.N.Y. Feb. 25, 2008). As described above, plaintiff alleges discriminatory conduct and a hostile work environment caused, in part, by defendants in a managerial position. A plausible inference may be drawn from his factual allegations that HASC had actual and constructive knowledge of its managers' conduct; indeed, Druker alleged represented that HASC did not want to hear non-Orthodox Jews. Plaintiff has therefore stated a claim for employer liability under the NYCHRL.

## CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part as set forth above.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      February 27, 2018